STATE OF IOWA, Appellant, v. NAT MORTON, Appellee.

LARCENY: Evidence—Sufficiency. Evidence held sufficient to gen-erate a jury question on the issue of larceny.

*Appeal from Harrison District Court.*—TOM C. WHITMORE, Judge.

JUNE 24, 1924.

DEFENDANT was indicted for the crime of grand larceny, the indictment charging that defendant did steal from the high-way, at or near the premises of Raymond Croghan, 35 or 40 hogs, the same being the property of said Croghan. Trial to a jury. The defendant's motion for a directed verdict at the close of the State's evidence was overruled, but sustained after defendant had introduced his evidence, and the defendant was acquitted by direction of the court. The ruling was on the theory that the evidence was insufficient to take the case to the jury, or to sustain a verdict of guilty, the court stating:

"I feel that there hasn't been evidence beyond a reason-able doubt; that there has been no felonious taking: and the court is not entirely satisfied that there is evidence beyond a reasonable doubt that there has been any taking."

The State appeals.—*Reversed.*

*Ben J. Gibson,* Attorney-general, *Maxwell A. O'Brien,* Assistant Attorney-general, and *Roy Havens,* County Attorney, for appellant.

*Tinley, Mitchell, Ross & Mitchell* and *William P. Welch,* for appellee.

PRESTON, J.—From the foregoing statement it will be seen that the only question is as to the sufficiency of the evidence. We shall refer to the substance of it, without going into all the minor details.

The defendant, 28 years old, is in partnership with his father, and carries on a part of his father's land. Defendant lived west, just across a ravine, from his father's place. Defendant lives on the west side of the ravine and on the south side of the highway. Croghan, the prosecuting witness, at the time of this transaction, in the fall of 1921, and defendant were living on adjoining farms, with a highway between, defendant on the south side of the road. His buildings and feed yards were close to the highway. On the north side of the highway was Croghan's field, or pasture, and his buildings were not near the highway at that place. West of defendant's buildings and yards there is a bridge in the highway across a creek running north and south. At this time, Croghan had about 97 to 100 head of hogs. In November, 1921, he missed about 43 shoats and five old sows. Three or four days after he missed his hogs, he went to defendant's place to look for them, and claims he saw 33 or 34 of his shoats and two of his sows in Morton's yards. He did not then go all over the yards. While he was at defendant's place, defendant pointed out four yellow shoats and two old sows, and said to Croghan that they were his (Croghan's); that the rest of the hogs were his own (Morton's); that defendant said he marked all of them down there. At this time, Croghan noticed that all his shoats that he recognized there as belonging to him had been marked with a slit in the right ear, and that the marking had been done recently; the blood was still on the ears. The four yellow shoats which defendant said belonged to Croghan had also been marked with Morton's mark.

Croghan testified that he took the four shoats and two old hogs home that day.

"My hogs had been running out on pasture and in the cornfield, and they were more rough; not in as good shape as defendant's; bonier, lighter red than defendant's."

Croghan also testified that he told defendant that the hogs were his, and that defendant claimed that they were his (defendant's), except the three or four which he admitted belonged to Croghan; that he had been sued by defendant for $1,000, just before this indictment was returned. Croghan and Myers, whose testimony will be referred to in a moment, are corroborated by Tierney, who, soon afterwards, when hauling corn, saw Croghan's hogs in defendant's yards. A witness for the State, Harold Myers, lived east of the senior Morton's place. He used a team in farming, and the barn where the horses were kept was west of the house of the senior Morton. Myers began working for defendant August 29, 1921, and stayed there until February 8th following. He testifies substantially that, upon one occasion in the fall of 1921, defendant called to him to come and help run in some hogs; that it was in November, 1921; that he had made an affidavit that it was September 15th, but made that without recalling to mind when it happened; that, in answer to this call, he went to where defendant and defendant's wife were, at the bridge before referred to; that, when he got there, there was a hole in the fence between the highway and the Croghan land, and some of the hogs were in the highway, and some were in the field; that some of the hogs ran back into the field; that defendant went over into the field and drove them out into the highway, and directed witness Myers and Mrs. Morton to assist him in driving these hogs over into one of defendant's lots or small pastures; that, after defendant ran the hogs into that first lot, he closed the opening with a board partition; that these hogs were Croghan's. Myers further testifies that, at the time the hogs were driven from the field and the highway into defendant's feed lot, defendant knew and stated to the witness Myers that they were Croghan's hogs; that, when Myers was called by defendant, and when Myers went to the place, about half the herd were in the highway and half in the

field; that there were about 35 or 40 hogs driven into the prem-
ises of defendant at this time; that among these hogs were two
old sows, and they had marks upon them; that the hogs were
kept in the first lot or pasture for two days, and then put into
a feed yard with the cattle; that, a day or two after that, defend-
ant had the witness Myers assist him to mark the Croghan hogs
by cutting a slit in the right ear, which was Morton's mark;
that, just after they finished marking them, defendant said to
Myers, "Don't say anything about this, will you?" and further
said, "Raymond [Croghan] don't know how many hogs he has
got,—he will never know the difference." Witness further tes-
tified that Morton trimmed some of the Croghan hogs, at the
time of the marking; that this was the latter part of November;
that, about a month after defendant got the hogs, he, defend-
ant, made a statement to Myers, in substance that a certain
hog that he had in the yard was one of the hogs he had got
from Croghan; that he had no arrangement with defendant for
any interest in the stolen property; that, in March, after Myers
had quit working for defendant and had gone to Puckett's, de-
fendant and his wife visited Myers, and at that time, while
defendant and Myers were alone, defendant said to Myers, "I
would rather not have you say anything about this, because it
will make trouble for me." Myers further testifies that the
first he knew that defendant was attempting to run in the hogs
was when he called; that there was never any talk about Myers's
having any interest or profit in the hogs of Croghan that were
run in. Croghan never got any of the hogs back from defend-
ant, except four shoats and two old sows.

Practically the only denial of this evidence is in the testi-
mony of defendant and his wife. Defendant introduced several
witnesses as to his good character. Another witness identified
a plat showing the premises. The defendant's father testified
to his being in the cattle business, and as to the arrangement be-
tween himself and the defendant, and the date when Myers be-
gan and quit working for defendant. Witness testified that he
saw Croghan and his son in the feed yards; that he did not see
him take away any hogs, but did not see him when he left; that
he never saw two large sows with slit in the ear in his pens;

that Tierney brought some corn to his place, and he thinks it was in September or October.

It is claimed by defendant that the evidence shows that the hogs from the pasture of Croghan could come down and get into the yard of defendant, and that defendant's wife frequently drove the shoats back out of her yard.

Defendant, as a witness in his own behalf, denied the statements of witness Myers as to taking hogs from the Croghan field or highway; denied the conversations; and denied substantially all the testimony for the State. He says he did assist Myers in putting up some shoats, between the 15th and 26th of September; that just he and Myers were present; that the hogs were in front of the barn; that they were his hogs,—10 or 15; that he trimmed and marked hogs between September 15th and 20th,— none in October, November, or December; that he never marked a single hog that belonged to Croghan; that he marked some light hogs; that he did not know whose hogs they were; that he phoned Croghan that he thought he had some of Croghan's hogs there, and wanted him to come down and get them,—take them home and keep them home.

"He came down. Told him I had three yellow pigs there I thought belonged to him. He said, 'No, they are not.' He picked out two red pigs that he said might be his. I said, 'There is another yellow pig that you didn't see.' He didn't see it, and I said, 'If it don't make any difference to you, I will catch a red pig about the same size, and you can have it;' and he did, and said it was all right. He took the three in his wagon. He never drove off two old sows and three or four pigs when I was present. Croghan never came to our feed yard and claimed we had 33 or 34 of his pigs; never pointed out any bunch of hogs in the fall of 1921 he claimed belonged to him. In the summer and fall of 1921, Croghan's hogs bothered us around the house,—or at least they came from Croghan's field. September 22, 1921, I hauled a load of hogs to town. I have the check. When I came home, my wife complained about having put up some hogs. Did not raise any light-colored hogs. Am not in the habit of marking hogs which do not belong to me; this was

the first time. The year before, I marked one, but I didn't know it didn't belong to me.''

Defendant's wife testifies:

''20 or 25 hogs came out of Croghan's pasture into the road during the months of August and September. Never saw any big hogs down there. The day my husband took a load of hogs to town, September 22, Myers and I put up these shoats at 1 o'clock in the afternoon,—red hogs. There were two or three red and black spotted pigs in the bunch, running around the chicken yard. One of them was a runt, and I picked up a board and killed it. On the morning of the 22d of September, drove these hogs out of the yard and tried to keep them out. Told my husband that morning. He said he didn't have time to help me then, and he would have Myers help me after dinner. I had the hogs out in the road and almost to the bridge when Myers came across. Think there were 20 or 25 of these shoats, mostly red. Myers wanted to know how we could keep them in the lot. He went to the barn and got a partition gate, and we put it across the hole through which we drove the pigs into the lot. That was the only time Myers helped me put up some hogs. My husband was not there at that time.''

She testifies to hearing her husband phone Croghan to come down and see if they were his and get them; that Croghan came down in a day or two; that she saw the wagon; that she does not know whether they put the pigs in the wagon; that she knows Croghan was there with her husband; that she never saw Croghan drive away two large sows and four pigs. She denies Myers's testimony that the three of them put up the hogs.

''When we put the hogs in the lot, we supposed they were Croghan's hogs that came out of his pasture. We didn't want to mix them with ours, and thought, if we shut them in the yard by themselves, that he could come down after them, without any chance of them being mixed with ours.''

The foregoing is the substance of the testimony. While there is a conflict in the evidence, it is quite clear that it was a question for the jury, and not for the court, to determine whether the evidence showed, beyond a reasonable doubt, the guilt of defendant, and whether there had been a taking. A

number of cases are cited by the State, but we feel so clear about it that it is unnecessary to refer to them. The judgment is reversed. Defendant having been acquitted, there will be no remand.—*Reversed.*

ARTHUR, C. J., EVANS and FAVILLE, JJ., concur.